*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

DORAN TASHAWN DUNCAN,

       Defendant-Appellant.

UNPUBLISHED
June 10, 2021

No. 350983
Shiawassee Circuit Court
LC No. 2018-002852-FC

Before: GADOLA, P.J., and SAWYER and RIORDAN, JJ.

PER CURIAM.

A jury convicted defendant of first-degree felony murder, MCL 750.316(1)(b); carrying a concealed weapon (CCW), MCL 750.227; possession of a firearm by a felon (felon-in-possession), MCL 750.224f; possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b; operating a vehicle while intoxicated or impaired by alcohol or a controlled substance (OWI) causing death, MCL 257.625(4); and reckless driving causing death, MCL 257.626(4). The trial court sentenced defendant as an habitual offender, second offense, MCL 769.10, to concurrent prison terms of life without parole for the felony-murder conviction, 28 to 90 months for the CCW and felon-in-possession convictions, and 125 to 270 months for the OWI and reckless driving convictions, to be served consecutive to a two-year prison term for the felony-firearm conviction. Defendant appeals as of right. We affirm.

## I. FACTS AND PROCEEDINGS

Defendant's convictions arise from a serious automobile accident that resulted in the death of George Ramos. On the afternoon of May 18, 2018, defendant was a passenger in a white 2005 Cadillac Deville driven by Kayla Hitz. The vehicle stopped on the side of Sheridan Road, one mile from the intersection with M-13 in Saginaw County. A witness saw Hitz and defendant scuffling in the car and heard Hitz yell at defendant to get off of her. Hitz got out of the car and began walking down the road. Defendant also got out of the car and the two continued to argue. As defendant began to follow Hitz, she turned around and said, "I'm going to shoot your ass." Hitz took a gun from her purse and shot toward defendant four to six times as he stood near the passenger side of the car. Hitz got into the car, started the car, and began to drive off, leaving

-1-

defendant behind. Defendant opened the car door while the car was moving and jumped in. The witness's son called 911 to report the incident.

Just before 3:00 p.m., a "be-on-the-lookout" dispatch was radioed to all officers in the area for a white Cadillac with two occupants heading southbound on M-13 toward Shiawassee County. The dispatch indicated that a female occupant had fired shots at a male occupant using a handgun. Shiawassee County Sergeant Brian Smith initiated a traffic stop on the Cadillac at 3:01:26 p.m. Sergeant Smith stopped his vehicle 20 to 25 feet behind the Cadillac, and used felony stop procedures. He pulled out his gun and pointed it at the Cadillac as he stood in the crook between the door and the passenger compartment of his cruiser and shouted instructions to the occupants to turn off the vehicle and keep their hands where he could see them. Village of Lennon Chief of Police Rich Folaron approached from the north and stopped his vehicle in front of the Cadillac. At 3:02 p.m., Sergeant Smith radioed to Chief Folaron to move his vehicle behind Smith's vehicle. Chief Folaron immediately responded that he saw "a lot of action inside that car." Defendant and Hitz exchanged seats, and Hitz got out of the vehicle through the passenger's door and fell onto the ground. At 3:02:21 p.m., defendant sped off "full throttle," heading southbound on M-13.

Witnesses testified that the white Cadillac drove through the village of Lennon at an estimated speed of 80 to 85 miles per hour in a 35-mile-per-hour zone. Witnesses also reported that the Cadillac was entering the northbound traffic lane while passing vehicles, forcing northbound drivers to leave the roadway to avoid colliding with the Cadillac. One northbound driver who had to swerve off the road testified that as the Cadillac sped between his vehicle and the vehicle that the Cadillac was passing, the driver of the Cadillac "hit the accelerator" and the "engine went full throttle." Another southbound driver said that the Cadillac passed him in the northbound lane going at least 100 miles per hour and that northbound vehicles were being forced off the road. The Cadillac was traveling south on M-13 toward the intersection with I-69.

About the same time, George Ramos had just exited westbound I-69 and his car, a Cobalt, was stopped at the end of the off-ramp ramp waiting to turn left to head northbound on M-13. As the Cobalt made a left turn, the Cadillac struck the Cobalt nearly head-on, killing Ramos. Chief Folaron did not regain sight of the Cadillac until he got to the intersection of M-13 and I-69 and saw that it had crashed. The crash was reported at 3:04:59 p.m. According to a Michigan State Police accident reconstructionist, the event data recorder obtained from the Cadillac showed that the Cadillac was moving at 107 miles per hour from two to five seconds before impact, and was moving at 104 miles per hour one second before impact. The event data recorder obtained from the Cobalt showed that the Cobalt was stationary four seconds before impact, was moving at four miles per hour three seconds before impact, was moving at 10 miles per hour two seconds before impact, and was moving at 12 miles per hour one second before impact. There was no evidence at the scene of preimpact braking by the Cadillac. The Cadillac was 470 feet to the north when the Cobalt began to enter the traveled lanes three seconds before impact. If the Cadillac had been traveling at the posted speed limit of 55 miles per hour, the Cobalt would have had six seconds to complete its turn. The accident reconstructionist testified that the Cadillac caused the accident. Forensic testing of defendant's blood after the accident showed that defendant had six nanograms of active tetrahydrocannabinol (THC) and 52 nanograms of inactive THC in his system.

Police discovered two firearms in the Cadillac, a nine-millimeter handgun legally registered to Hitz and a loaded .40-caliber handgun with the serial number obliterated. Defendant

was wearing an empty foam gun holster at the time of the accident. According to the forensic science testimony, it was 470 billion times more likely that defendant was a contributor to the DNA on the .40-caliber gun than an unrelated unknown individual.

## II. SUFFICIENCY OF THE EVIDENCE—FELONY-MURDER

Defendant argues that the evidence presented at trial was insufficient to support his conviction of felony murder. He challenges the sufficiency of the evidence on two fronts, first contending that it was insufficient to prove that he committed the underlying larceny of the Cadillac, and second, contending that it was insufficient to prove the malice element of felony murder.

We review de novo a challenge to the sufficiency of the evidence. *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015). In *People v Mikulen*, 324 Mich App 14, 20; 919 NW2d 454 (2018), this Court recited the principles governing a claim that there was insufficient evidence to sustain a verdict:

> In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt. A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses. Circumstantial evidence and the reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime. The prosecution need not negate every reasonable theory of innocence; instead, it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. We resolve all conflicts in the evidence in favor of the prosecution. [Citations omitted.]

In *People v Carines*, 460 Mich 750, 758-759; 597 NW2d 130 (1999), the Court explained:

> The elements of felony murder are: (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [the statute, including armed robbery].
>
> The facts and circumstances of the killing may give rise to an inference of malice. A jury may infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm. [Citations omitted.]

The prosecution's theory was that defendant committed the offense of larceny, involving the theft of the Cadillac. "[L]arceny of any kind" is among the enumerated offenses that can support a felony-murder conviction. MCL 750.316(1)(b). In *People v March*, 499 Mich 389, 399; 886 NW2d 396 (2016), the Court observed that there is "no statutory definition of larceny in

Michigan, and all statutes use the term in its common-law sense." [Quotation marks and citation omitted.] *March* further observed the following:

> This Court has relied on that common law to establish the general elements of simple larceny: "[A]t common law simple larceny was defined as 'the felonious taking, and carrying away, of the personal goods of another.'" *People v Randolph*, 466 Mich 532, 542-543; 648 NW2d 164 (2002), quoting 4 Blackstone, Commentaries on the Laws of England, p 229. We have also described larceny as the "unlawful taking of the personal property of another with the felonious intent to deprive the owner of it." *People v Johnson*, 81 Mich 573, 576; 45 NW 1119 (1890).
>
> These articulations of the common law can be parsed in turn into the following elements: (a) a trespassory taking and (b) the carrying away (c) of the personal property (d) of another (e) with intent to steal that property. [*March*, 499 Mich at 401 (footnotes omitted).]

Here, the jury was instructed on the offense of larceny as follows:

> For the crime of Larceny, the prosecutors must prove each of the following elements beyond a reasonable doubt:
>
> First, that the Defendant took somebody else's property.
>
> Second, that the property was taken without consent.
>
> Third, there was some movement of property.
>
> Fourth, that at the time the property was taken, the Defendant intended to permanently deprive the owner of the property.
>
> When someone takes property because he honestly believes that he has a right to use it, that's not Larceny, even if the person who took it was mistaken.[1]

Defendant argues that the evidence was insufficient to show that he took the Cadillac without Hitz's consent. However, Hitz testified[2] that she did not give defendant permission to take her car and that defendant stole her car. Hitz's testimony was sufficient to allow the jury to find beyond a reasonable doubt that defendant did not have consent to take Hitz's car.

Defendant also argues that the evidence was insufficient to show that he intended to permanently deprive Hitz of her car. He argues that because he and Hitz were friendly, the prosecution failed to prove beyond a reasonable doubt that he intended never to return the car. Defendant has provided no authority for the argument that one cannot intend to permanently

---

[1] This instruction was consistent with M Crim JI 23.1, which sets forth the elements of larceny.

[2] Hitz was declared unavailable and her preliminary examination testimony was read to the jury.

-4-

deprive a person one knows of his or her property. A prosecutor only needs to provide minimal circumstantial evidence to prove that the defendant had the requisite intent. *People v Johnson–El*, 299 Mich App 648, 653; 831 NW2d 478 (2013). This Court has held that evidence of the defendant's fleeing from the scene of the crime supports an inference of "consciousness of guilt," which may show intent. See *People v Goodin*, 257 Mich App 425, 432; 668 NW2d 392 (2003) (quotation marks and citation omitted). The jury could reasonably find from defendant's actions that he had the intent to permanently deprive Hitz of her car when he sped off in Hitz's car without her permission and left her behind. In addition, defendant testified that he intended to drive the car to Lansing, and he drove recklessly at speeds of over 100 miles per hour. These actions support the minimal circumstantial evidence necessary to prove that defendant intended to permanently deprive Hitz of her car. Viewed in a light most favorable to the prosecution, the evidence was sufficient to allow a rational trier of fact to find beyond a reasonable doubt that defendant committed the offense of larceny.

Defendant also argues that the evidence was not sufficient to support the requisite malice element of felony murder. Testimony indicated that defendant was driving at excessive speeds, including through a small village, to flee from police. Witnesses were shocked at how fast the Cadillac traveled on M-13 through the village of Lennon, and how fast it was traveling after it left the village and traveled toward I-69 after leaving Lennon. Witnesses said that the Cadillac passed several cars at an excessive rate of speed and forced drivers traveling in the opposite direction to go off of the road in order to avoid a collision with the Cadillac. An accident investigator determined that the Cadillac was traveling 107 miles per hour three seconds before the collision in a 55-mile-per-hour zone, and that the speed one second before impact was 104 miles per hour. Further, the evidence showed no preimpact braking that would have been able to stop the vehicle. A toxicology report demonstrated that defendant had active THC in his system. The evidence of defendant's continuous excessive speed after leaving the traffic stop sufficed to establish defendant's intent to do an act in a manner that created a very high risk of death or great bodily harm, with knowledge that death or great bodily harm was the probable result of driving in that manner. See *Carines*, 460 Mich at 758-759. Defendant asserts that his testimony—that he fled the scene because, as a black man, he was motivated by his legitimate fear of police—contradicts the notion that he acted with the requisite intent. However, the jury did not find his testimony credible. The jury decides issues of credibility. *Mikulen*, 324 Mich App at 20. Accordingly, the evidence was sufficient to allow a rational jury to find beyond a reasonable doubt that defendant committed felony murder.

## III. PROSECUTORIAL ERROR

Defendant argues that he was denied a fair trial by a vast array of prosecutorial errors. "Claims of prosecutorial misconduct are generally reviewed de novo to determine whether the defendant was denied a fair trial." *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013).[3] However, because these issues have not been preserved for review, we must review the

---

[3] "[A] more accurate label for most claims of prosecutorial misconduct is 'prosecutorial error,' while only the most extreme cases rise to the level of 'prosecutorial misconduct.' " *People v*

"unpreserved claim for plain error affecting defendant's substantial rights." *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Carines*, 460 Mich at 763. To show that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (quotation marks and citation omitted).

"[T]he test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "We must evaluate instances of prosecutorial misconduct on a case-by-case basis, reviewing the prosecutor's comments in context and in light of the defendant's arguments." *People v Lane*, 308 Mich App 38, 62-63; 862 NW2d 446 (2014). Prosecutors are afforded great latitude regarding their arguments. *Caddell*, 332 Mich App at 71. In making those arguments, "[a] prosecutor may not make a factual statement to the jury that is not supported by the evidence, but he or she is free to argue the evidence and all reasonable inferences arising from the evidence as they relate to his or her theory of the case." *Dobek*, 274 Mich App at 66 (citations omitted).

We initially note that in defendant's brief filed by counsel and in his Standard 4 brief, defendant argues that the prosecutor erred, but he fails to discuss the alleged errors in the context of the record, and he fails to present argument to demonstrate that any of the prosecutor's alleged errors affected his substantial rights. We therefore consider the arguments abandoned.[4] See *People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004) ("An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue."). However, we will address two of the arguments in which the prosecutor concedes error in order to determine whether the errors affected defendant's substantial rights.

First, the prosecution concedes that the prosecutor's cross-examination of defendant and closing argument made a factual statement that was not supported by the evidence when she insisted during the cross-examination of defendant and during closing arguments that defendant had testified on direct examination that Hitz threw the car keys to him during the traffic stop. The prosecutor used the misstatement of the evidence to argue that defendant was not being truthful. The jury, however, had recently heard defendant's testimony, which did not include testimony that Hitz gave him the keys, and defendant denied the prosecutor's erroneous interpretation of his prior testimony. In context, the references were not so egregious that any prejudice could not have been remedied by a curative instruction, nor did the references result in a miscarriage of justice. The error therefore did not affect defendant's substantial rights. See *People v Mayhew*, 236 Mich App

---

*Caddell*, 332 Mich App 27, 71 n 10; 955 NW2d 488 (2020). We thus refer to "prosecutorial error" unless quoting otherwise.

[4] Nonetheless, we have reviewed defendant's eight claims of error and conclude with respect to six of the claims that the prosecutor did not commit error.

112, 122-123; 600 NW2d 370 (1999) ("Because defendant failed to object to the alleged instances of prosecutorial conduct, we will only review this issue if a curative instruction could not have remedied the prejudicial effect of the prosecutor's comments or if the failure to consider the issue would result in a miscarriage of justice.").

Next, the plaintiff concedes that the prosecutor erred by asking defendant whether prosecution witnesses were lying when they offered testimony that was inconsistent with defendant's testimony. In *People v Buckey*, 424 Mich 1, 17; 378 NW2d 432 (1985), the Court held that it was "improper for the prosecutor to ask defendant to comment on the credibility of prosecution witnesses." In *Buckey*, portions of the defendant's testimony conflicted with the testimony of the complainant, eyewitnesses, and a police detective. *Id*. at 5-6, 7 n 3. The prosecutor asked the defendant during cross-examination whether the defendant thought that the prosecution's witnesses "were lying." *Id*. at 7 n 3, 16-17. *Buckey* noted that the prosecutor's strategy was to invite the defendant to label the prosecution's witnesses as liars and thereby discredit the defendant. *Id*. at 17. The Court found that this conduct was improper because the defendant's opinion of witnesses' credibility "is not probative of the matter." *Id*. The Court, however, held that the error did not result in unfair prejudice to the defendant and was harmless. *Id*. The Court reasoned that the "defendant dealt rather well with the questions," that defense counsel did not object to the questions, and that any prejudice could have been cured by a timely objection resulting in a prohibition on further questions of the type at issue or an appropriate cautionary instruction. *Id*. at 17-18.

Here, the prosecutor erred by asking defendant whether the witnesses were lying in order to discredit defendant. Defendant does not attempt to show that his substantial rights were affected by the error. As in *Buckey*, defendant handled the questions well. Additionally, trial counsel did not object to the questions, and any prejudice could have been cured by a timely objection. Further, the trial court advised the jury that "it's your job to decide what the facts of this case are. You must decide which witnesses you believe and how important you think their testimony is." Jurors are presumed to follow their instructions. *People v Stevens*, 498 Mich 162, 177; 869 NW2d 233 (2015). The error did not affect defendant's substantial rights.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he was denied the effective assistance of counsel, citing several alleged deficiencies in his trial counsel's performance. Because this Court denied defendant's motion to remand, our review is limited to errors apparent on the record. See *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

To establish ineffective assistance of counsel, a defendant must show both that counsel's representation fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Accordingly, a defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *Trakhtenberg*, 493 Mich at 52. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 US at 690. Secondly, defendant

must show a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). "[T]his Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). Counsel is presumed to have afforded effective assistance, and defendant bears a heavy burden of proving otherwise. *People v Traver*, 328 Mich App 418, 422; 937 NW2d 398 (2019).

Defendant failed to address the second prong of the ineffective assistance of counsel claims raised in his brief filed by appellate counsel and in his Standard 4 brief: prejudice. He simply argues that his trial counsel's performance was deficient without providing argument that counsel's failures may have affected the outcome of the trial. It is well settled that an "appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Nonetheless, we will briefly address defendant's significant arguments.

Defendant first argues that he had an irreconcilable conflict of interest with one of his two trial counsel because counsel, before being appointed as defendant's third court-appointed attorney, had moved to intervene on behalf of the Shiawassee County Public Defender's Office with respect to defendant's motion seeking authority to retain forensic experts to review the crime lab's forensic testing results. The motion to intervene asserted that the defender's office budget was limited and that defendant's motion failed to adequately explain a nexus between the crime lab's DNA results and the need for an independent expert. The trial court denied the motion to intervene. Defendant fails to explain how the public defender's office's unsuccessful motion to intervene presented an actual conflict of interest, and we cannot conceive of one on this record. Absent such an explanation, relief is not warranted.

Next, defendant argues that his counsel's failure to object to each of the alleged instances of prosecutorial error denied him the effective assistance of counsel because his claims of error are now subject to a plain error standard of review on appeal. We have concluded six of defendant's eight claims of error have been abandoned and will not address them further. With respect to the two instances of prosecutorial error that we have addressed—the prosecutor's misstatement of the facts when she asserted that defendant testified that Hitz threw the car keys to defendant, and the prosecutor's asking of defendant whether prosecution witnesses were lying when their testimony conflicted with defendant's testimony—defendant has failed to offer any argument to show a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." See *Strickland*, 466 US at 694. And for the same reasons that we previously concluded that these two errors did not affect defendant's substantial rights, we similarly conclude that defendant did not suffer *Strickland* prejudice as well.

Defendant also argues that trial counsel was ineffective by failing to request an evidentiary hearing regarding the prosecution's due diligence to produce Hitz for trial. Before the prosecution began its case-in-chief, the prosecutor made an offer of proof as to Hitz's unavailability and attempts to locate and serve her. Trial counsel also identified the efforts that the public defender's

investigator took to locate Hitz. Defendant fails to explain the need for an evidentiary hearing in light of the prosecution's offer of proof and the parties' arguments regarding due diligence, and he also fails to explain how he was prejudiced by his counsel's failure to request an evidentiary hearing under these circumstances. Relief is not warranted for this claim of error.

Defendant argues that his counsel was ineffective by failing to request a jury instruction on the defense of accident in accordance with M Crim JI 7.1, which provides:

> (1) The defendant says that [he / she] is not guilty of _____ because _____'s death was accidental. That is, the defendant says that _____ died because [describe outside force; e.g., "the gun went off as it hit the wall"].
>
> (2) If the defendant did not mean to [pull the trigger/(state other action)] then [he/she] is not guilty of murder. The prosecutor must prove beyond a reasonable doubt that the defendant meant to _____.

The "Use Note" provides: "This instruction is designed for use where the defendant alleges that the act itself was entirely accidental. It is meant to be used as a defense to a murder charge only."

Defendant argues that he did not have the intent to kill and that the victim's death was the result of an accident. Defendant appears to be basing his argument on the fact that the medical examiner determined that Ramos's manner of death was "accidental." However, the medical examiner testified that when a person is killed in a motor vehicle accident, the manner of death, by convention, is categorized as accidental unless the motor vehicle was being used as a weapon against the person who was killed. Overwhelming evidence of defendant's erratic driving at excessive speeds was presented. A death that results from a force set in motion by the defendant that is likely to cause death or great bodily harm cannot be considered accidental. One of the natural risks of driving erratically at excessive speed is a crash with another vehicle that could result in death or great bodily harm. Because the *mens rea* for felony murder was overwhelmingly established, the defense of accident was not tenable, and trial counsel's failure to request the jury instruction was not objectively unreasonable.[5]

Moreover, even if trial counsel was ineffective in this regard, defendant has failed to demonstrate a reasonable probability that the failure to instruct the jury on accident affected the outcome of trial. The trial court instructed the jury that to convict defendant of felony murder it must find that defendant had "one of these three states of mind: He intended to kill, or he intended to do great bodily harm to [the victim], or he knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of his actions." Thus, any finding that the victim's death was accidental would have been inconsistent with the jury's conviction of defendant for felony murder. Compare *People v Hawthorne*, 474 Mich 174, 185; 713 NW2d 724 (2006) (holding that the defendant failed to demonstrate that the trial court's failure

---

[5] Indeed, trial counsel argued in closing that defendant was guilty only of reckless driving causing death. Logically, the malice element of felony murder can be proven in much the same manner as the "willful and wanton disregard for safety" element of reckless driving causing death.

to instruct on the accident defense undermined the reliability of the verdict because the jury instructions on the intent element of murder were clear that a finding of accident would be inconsistent with a finding that the defendant possessed the intent requirement for murder).

Defendant also argues that his counsel was ineffective by failing to request a limiting instruction when the prosecutor was permitted to elicit evidence that defendant had outstanding warrants to show why defendant fled from the police. The trial court contemporaneously instructed the jury: "Please don't concern yourselves with what these warrants may be. . . . [I]t could be a parking ticket . . . or it could be a meter violation[;] . . . we don't know." The trial court's instruction was effectively a limiting instruction. Trial counsel's failure to specifically request a limiting instruction was not objectively unreasonable. Additionally, the trial court instructed the jury:

> There's evidence that the Defendant had outstanding warrants at the time of the alleged crimes. You may only consider those warrants in determining the Defendant's state of mind at the time of the alleged crimes. You may not consider them for any other purpose.

Jurors are presumed to follow their instructions. *Stevens*, 498 Mich at 177. Defendant has not shown a reasonable probability that the outcome of the trial would have been different had trial counsel requested a limiting instruction.

Defendant next presents an unintelligible argument regarding jury composition that does not coherently present a claim of ineffective assistance of counsel. Defendant's argument does not cite legal authority, nor does it offer any factual support. Further, our review is limited to mistakes apparent on the record, and there is no evidence on the record with respect to the jury array or the composition of the jury. This argument is abandoned. *Kelly*, 231 Mich App at 640-641.

Lastly, in his Standard 4 brief, defendant argues that his counsel was ineffective by failing to attempt "a reasonably substantial investigation." A defendant's ineffective assistance of counsel claim based on the failure to investigate or call witnesses will fail when the defendant does not produce affidavits describing testimony that would have been elicited from those witnesses or show how the proposed testimony would have benefited the defense. See *Davis*, 250 Mich App at 369. Defendant has not submitted affidavits in support of his arguments, and, therefore, his argument fails.

## V. MOTION TO DISQUALIFY JUDGE STEWART

Defendant argues that he was denied a fair and impartial trial by Judge Stewart's denial of his motion to disqualify the judge from presiding over defendant's trial. "This Court reviews a trial court's factual findings on a motion for disqualification for an abuse of discretion, but the application of the law to the facts is reviewed de novo." *People v Wade*, 283 Mich App 462, 469; 771 NW2d 447 (2009).

Defendant moved under MCR 2.003(C)(1)(a) and (b)[6] to disqualify Judge Stewart because Judge Stewart's son was killed as a result of a severe car crash a couple of months before trial was scheduled to begin in this matter. He asserted that Judge Stewart could not be unbiased and impartial and that potential jurors "might be sympathetic to the Judge's loss and not fully disclose any possible sympathy they may have to a grieving parent," and that they "could also develop some sympathy for [the judge] based upon emotional response they might . . . perceive." After a hearing, Judge Stewart denied the motion, stating that he had no bias against defendant, that his son's accident was completely different in that it was the result of driving in near-blizzard conditions, and that he was confident that he could preside over the trial fairly and impartially. Defendant sought review by the chief judge, who also denied the motion.

"[A] party challenging the impartiality of a judge must overcome a heavy presumption of judicial impartiality." *Van Buren Charter Twp v Garter Belt, Inc*, 258 Mich App 594, 598, 673 NW2d 111 (2003) (quotation marks and citation omitted). Here, defendant did not present evidence of actual bias against him, nor did the record suggest a serious risk of actual bias or a failure to adhere to Canon 2 of the CJC. See MCR 2.003(C)(1)(a)-(b). Defendant's grounds for disqualification were speculative and not based upon anything other than the fact that Judge Stewart's son had been killed in an automobile accident under circumstances that were not similar to the facts of this case. Defendant did not allege any facts that would lead to an objective and reasonable perception that Judge Stewart could not carry on his responsibilities with integrity, impartiality, and competence. We conclude that the trial court did not err by denying defendant's motion to disqualify Judge Stewart. But even assuming that the trial court had erred, defendant does not on appeal assert that Judge Stewart demonstrated any bias during trial or that he failed to adhere to the appearance of impropriety standard in Canon 2 of the CJC such that defendant was denied a fair and impartial trial. For this additional reason, relief is not warranted.

## VI. CONCLUSION

There were no errors warranting relief. Accordingly, we affirm.

/s/ Michael F. Gadola
/s/ David H. Sawyer
/s/ Michael J. Riordan

---

[6] MCR 2.003(C)(1)(a) provides that disqualification is warranted when "[t]he judge is biased or prejudiced for or against a party or attorney," and MCR 2.003(C)(1)(b) provides that disqualification is warranted when "[t]he judge, based on objective and reasonable perceptions, has either (*i*) a serious risk of actual bias impacting the due process rights of a party as enunciated in *Caperton v Massey*, 556 US 868; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), or (*ii*) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct."